## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

**MARINER WEALTH ADVISORS, LLC,**

           **Plaintiff,**               **Case No. 1:24-cv-351**

           **v.**                      **JUDGE DOUGLAS R. COLE**

**SAVVY ADVISORS, INC., et al.,**

           **Defendants.**

### OPINION AND ORDER

During their employment at Mariner Wealth Advisors, LLC, (Mariner), Defendants Brad Morgan, Nate Kunkel, and Timothy Gerard (collectively, Individual Defendants) signed contracts containing non-solicitation and confidentiality provisions. After all three left Mariner to join Savvy Advisors, Inc. (Savvy), a company that competes with Mariner, Mariner filed this lawsuit alleging that they violated those provisions. (*See generally* Compl., Doc. 1). Soon after, Mariner filed a motion seeking both a temporary restraining order (TRO) and a preliminary injunction (PI), (Doc. 9), along with a motion for limited expedited discovery, (Doc. 10). The Court held an informal preliminary telephone conference with the parties at which it directed the parties to confer about a proposed calendar for limited expedited discovery and a preliminary injunction hearing. (7/8/24 Min. Entry). In the meantime, the matter is now before the Court on the requested TRO. For the reasons discussed below, the Court **GRANTS IN PART** Mariner's Motion for Temporary Restraining Order (Doc. 9). More specifically, the Court will grant the request for a TRO, but only

to the extent of preventing Individual Defendants from soliciting the Mariner customers specified in their non-solicitation agreements. Moreover, the Court defines "soliciting" not to cover contacts that the Individual Defendants make solely to inform their former clients of their new contact information, and which include no invitation to engage in business with Individual Defendants at their new employer. Beyond that, the Court will hold the remaining issues (relating to a preliminary injunction hearing and discovery for the same) in abeyance while the parties confer about a briefing and hearing schedule.

## BACKGROUND[1]

Mariner is a comprehensive wealth management company headquartered in Kansas. (Doc. 1, #2, 5). Morgan began working there in 2014, while Kunkel and Gerard both began working there in 2018. (*Id.* at #5–6). All three Individual Defendants held customer-facing roles in which they primarily provided wealth management services to Mariner's Procter & Gamble (P&G) customers. (*Id.* at #6–8). They therefore had access to customer information, pricing information, and other information about Mariner's business model. (*Id.*). Before joining Mariner, none of the three Individual Defendants worked as financial advisors or otherwise provided wealth management services. (Pl.'s Suppl. Mem. in Supp. of Pl.'s Mot. for TRO and Prelim. Inj. (Plaintiff's Supplemental Memo), Doc. 18, #272). But both Morgan and

---

[1] Unless otherwise noted, facts for which the Court cites only the Complaint are facts that Defendants have not disputed during the telephone conference or in their briefing. Similarly, facts provided without any document citation are based on the parties' representations during the telephone conference.

Kunkel are now certified financial planners (CFPs), (*id.*). a certification it appears they earned while employed at Mariner.

## A.    The Restrictive Covenants

As a condition of continued employment at Mariner, each Individual Defendant signed a Non-Solicitation and Confidentiality Agreement (NSCA). (Doc. 1-2, #36–61 (Morgan's NSCA); Doc. 1-3, #66–74 (Kunkel's NSCA); Doc. 1-4, #76–81 (Gerard's NSCA)). Each NSCA contains various restrictive covenants. As relevant here, the customer non-solicitation provision in each NSCA states that:

> Employee covenants and agrees that during Employee's employment with the Company and for two (2) years following the termination of Employee's employment with the Company, Employee shall not, directly or indirectly … solicit, divert, take away, attempt to take away, or otherwise interfere with the business of the Company's customers for whom Employee provided services, [or] with whom Employee actually did business[.]

(Doc. 1-2 ¶ 3(b), #40; Doc. 1-3 ¶ 3(b), #70; Doc. 1-4 ¶ 3(b), #78). Morgan's NSCA also prohibits him from soliciting customers he "otherwise became aware of as a result of his[] role with [Mariner]." (Doc. 1-2 ¶ 3(b), #40).

Each NSCA also prohibits Defendants from soliciting employees or persons with whom Mariner does business to end their relationships with Mariner. (Doc. 1-2 ¶ 3(c), #40; Doc. 1-3 ¶ 3(c), #70; Doc. 1-4 ¶ 3(c), #78). That second non-solicitation provision prohibits Individual Defendants from "initiat[ing] contact with or solicit[ing] any employee of [Mariner] for the purpose of hiring or attempting to hire" them; "attempt[ing] to influence any employee to" leave Mariner; "hir[ing] or otherwise engag[ing] any employee of [Mariner] for professional services that are in

competition with [Mariner]"; "induc[ing] … any employee of" Mariner to leave; or "induc[ing] any supplier, vendor, licensor, licensee, business relation, representative or agent of [Mariner] to terminate or modify its relationship with [Mariner]." (Doc. 1-2 ¶ 3(c), #40; Doc. 1-3 ¶ 3(c), #70; Doc. 1-4 ¶ 3(c), #78).

The confidentiality provision, meanwhile, states that "Employee shall not, at any time during or following the term of Employee's employment with the Company directly or indirectly, except in furtherance of the Company business and in accordance with the Company policies, use, disseminate, divulge or disclose, for any purpose whatsoever, any Confidential Information." (Doc. 1-2 ¶ 2(a), #38; Doc. 1-3 ¶ 2(a), #68; Doc. 1-4 ¶ 2(a), #76–77). Morgan's and Kunkel's NSCAs further prohibit using "Confidential Information to identify existing Company customers for Employee's own personal benefit or the benefit of any other firm or entity." (Doc. 1-2 ¶ 2(c), #39; Doc. 1-3 ¶ 2(c), #69). And Morgan and Kunkel's NSCAs likewise prohibit "us[ing] Confidential Information to facilitate" solicitation of Mariner customers or "otherwise compete against" Mariner. (Doc. 1-2 ¶ 2(c), #39; Doc. 1-3 ¶ 2(c), #69).

Last, all three NSCAs contractually obligated each Individual Defendant to comply with a notice period when resigning from his position at Mariner. (Doc. 1-2 ¶ 1(a), #36; Doc. 1-3 ¶ 1(a), #66; Doc. 1-4 ¶ 1(a), #76). Kunkel and Morgan had 90-day notice periods. (Doc. 1-2 ¶ 1(a), #36; Doc. 1-3 ¶ 1(a), #66). And Gerard had a 10-day notice period. (Doc. 1-4 ¶ 1(a), #76).

4

**B.      Individual Defendants' Departure from Mariner**

In May 2024, Individual Defendants left Mariner to begin working for Savvy, a competing wealth management company. (Doc. 1, #13, 17–18). Kunkel resigned on May 14, 2024, without providing notice (more on that below). (*Id.* at #17). Morgan resigned on May 23, 2024, effective August 20, 2024 (reflecting the 90-day notice period). (*Id.* at #18). And Gerard resigned on May 24, 2024, and began working for Savvy after his 10-day notice period. (*Id.*).

While the dates of each Individual Defendant's resignation are undisputed, the parties dispute certain circumstances of those resignations. On the confidential information front, the Complaint alleges that Morgan stole confidential information by downloading a customer invite list for a months-old Mariner event. (Doc. 1, #16). But at the telephone conference, Morgan's counsel represented to the Court that Morgan downloaded the spreadsheet from a cloud account to his Mariner work laptop to do work for Mariner, and that he then returned the laptop to Mariner when he left the company and did not keep a copy (electronic or hard copy) of the information. Morgan has since filed a declaration attesting the same. (Doc. 17-1, #264 ("I 'dragged' this document … to my work laptop's desktop. I did not transfer this document off my work laptop, and I returned my work laptop to Mariner on June 3, 2024. I do not have this document in paper or electronic form, and I did not give this document to any third party.").

Similarly, the Complaint alleges that, "[o]n May 11, 2024, Morgan spent the entire day forwarding personal appointments and activities from his Mariner account to his personal Gmail account." (Doc. 1, #17). But Morgan attested in his declaration

5

that "[t]hese were personal appointments and to the best of [his] recollection did not include appointments with clients. To the best of [his] knowledge, [he] do[es] not have any Mariner confidential client information." (Doc. 17-1, #265). And Plaintiff conceded during the telephone conference that it had no evidence to the contrary.

The Complaint also alleges that Kunkel violated his contractual notice obligations. (Doc. 1, #17). But Kunkel's counsel represented at the telephone conference that, based on the contract's plain language, Kunkel did not believe the notice provision in his NSCA applied to him at the time he resigned. Counsel also argued that any ambiguity in the NSCA should be construed in Kunkel's favor. To spell that out, the notice provision in Kunkel's NSCA appears in paragraph 1(a). That paragraph begins by noting that Kunkel's employment at Mariner is generally at-will. (Doc. 1-3 ¶ 1(a), #66). But it then adds: "Provided, however, that if Employee has been employed by the Company for at least one (1) year, the terminating party must provide notice in writing to the other party at least ninety (90) days prior to the date of termination (the 'Notice Period')." (*Id.*). Kunkel signed the NCSA on June 21, 2023, (Doc. 1-3, #74 (NSCA signature block dated June 21, 2023)). And he resigned on May 14, 2024, (Doc. 1, #17). So he contends that the 90-day notice provision in his NSCA is inapplicable because he worked for Mariner for less than one year after signing the NSCA. Mariner by contrast, contends the "has been employed" phrase also includes any time the employee worked for Mariner *before* signing the NCSA. Under that interpretation, Kunkel (who joined Mariner in 2018) already satisfied the employed-

6

for-at-least-one-year contingency at the time he signed the agreement, making him subject to the 90-day notice requirement.

As for Morgan, while he provided the 90-day notice, Mariner fired him before the full 90-day period expired. He started at Savvy immediately thereafter.

## C.  Procedural History

Based on the allegations described above, Mariner sued Morgan, Kunkel, Gerard, and Savvy (collectively, Defendants) on June 26, 2024. (Doc. 1). It resubmitted a text-searchable but otherwise identical version of the Complaint the next day. (Doc. 5). Mariner asserts nine counts: one count collectively against all Defendants for breach of the Defend Trade Secrets Act, 18 U.S.C. § 1836 (Count I); one count, again against all Defendants, for breach of the Ohio Uniform Trade Secrets Act, Ohio Rev. Code § 1333.61(D) (Count II); one count against each Individual Defendant for breach of contract (Counts III (Morgan), IV (Kunkel), and V (Gerard)); one count against Savvy for tortious interference with contract (Count VI); one count against all Defendants for tortious interference with business relations (Count VII); one count against all Individual Defendants for breach of fiduciary duty (Count VIII); and one count against all Defendants for civil conspiracy (Count IX). (Doc. 1, #22–29).

A week later, on July 3, 2024, Mariner filed two motions: one seeking a TRO and PI, (Doc. 9), and one seeking limited expedited discovery before a PI hearing, (Doc. 10). The first motion seeks to enjoin Defendants from using confidential information, soliciting Mariner customers and employees, or hiring any Mariner employees to compete with Mariner. (Doc. 9, #215–16). And the second seeks 60 days

to conduct expedited discovery related to customer contacts, any confidential information in Defendants' possession, and "communications by and between the Defendants concerning the facts alleged in Mariner's complaint." (Doc. 10, #251).

The Court held an informal preliminary telephone conference with the parties on July 8, 2024, where, among other things, it heard argument on the motion for a TRO. (7/8/24 Min. Entry). At the end of that conference, the Court directed Defendants' counsel to file by the following day an affidavit from Morgan supporting representations counsel made during that conference. (*Id.*). It also directed the parties to file competing briefs by the close of business on July 11, 2024, discussing (1) how the Court should define "solicitation" in the NSCA and what activities a prohibition on solicitation should cover, along with (2) what role, if any, the Certified Financial Planner (CFP) Code of Ethics should play in interpreting the non-solicitation agreement. (*Id.*). And it instructed the parties to confer and, if possible, jointly submit a proposed calendar for limited discovery and a preliminary injunction hearing schedule. (*Id.*)

Defendant timely submitted Morgan's declaration. (Doc. 17). And both parties timely submitted their supplemental briefing. (Doc. 18; Defs.' Br. Regarding Definition of Solicitation and Fiduciary Obligations (Defendants' Brief), Doc. 19).

The matter is now ripe for the Court's review as to the request for a TRO.

## LEGAL STANDARD

"A temporary restraining order is an extraordinary remedy that should only be granted if the movant can clearly show the need for one." *Kendall Holdings, Ltd.*

8

*v. Eden Cryogenics LLC*, 630 F. Supp. 2d 853, 860 (S.D. Ohio 2008). Ultimately, "the purpose of a TRO under Rule 65 is to preserve the status quo so that a reasoned resolution of a dispute may be had." *Procter & Gamble Co. v. Bankers Tr. Co.*, 78 F.3d 219, 226 (6th Cir. 1996). Plaintiffs "bear[] the burden of establishing entitlement to a temporary restraining order." *Mesa Indus., Inc. v. Charter Indus. Supply, Inc.*, No. 1:22-cv-160, 2022 WL 1044720, at *4 (S.D. Ohio Apr. 7, 2022). "To satisfy this burden, [Plaintiffs] must establish [their] case by clear and convincing evidence." *Id.* And that in turn means that Plaintiffs "may not merely rely on unsupported allegations, but rather must come forward with more than 'scant evidence' to substantiate their allegations." *Patel v. AR Grp. Tenn., LLC*, No. 3:20-cv-52, 2020 WL 5849346, at *4 (M.D. Tenn. Oct. 1, 2020) (collecting cases); *accord Amedisys, Inc. v. Interim Healthcare of Wichita, Inc.*, No. 14-1357, 2015 WL 1912308, at *2 (D. Kan. Apr. 27, 2015) ("[W]holly conclusory statements alone will not constitute irreparable harm.").

Whether a movant is entitled to this extraordinary relief is governed by the same four factors that apply to preliminary injunctions. *Ohio Republican Party v. Brunner*, 543 F.3d 357, 361 (6th Cir. 2008) ("In determining whether to stay the TRO, we consider the same factors considered in determining whether to issue a TRO or preliminary injunction." (cleaned up)); *ABX Air, Inc. v. Int'l Bhd. of Teamsters, Airline Div.*, 219 F. Supp. 3d 665, 670 (S.D. Ohio 2016) ("The standard for issuing a temporary restraining order is logically the same as for a preliminary injunction with emphasis, however, on irreparable harm given that the purpose of a temporary restraining order is to maintain the status quo." (cleaned up)). Those factors are:

(1) whether the movant has a substantial likelihood or probability of success on the merits; (2) whether the movant will suffer irreparable injury if injunctive relief is not granted; (3) whether the injunctive relief would unjustifiably harm a third party; and (4) whether the public interest would be served by issuing the injunctive relief. *Frisch's Rest., Inc. v. Shoney's Inc.*, 759 F.2d 1261, 1263 (6th Cir. 1985). Failure to meet the likelihood of success prong is not dispositive. *Id.* at 1270; *Ne. Ohio Coal. for Homeless & Serv. Emps. Int'l Union, Loc. 1199 v. Blackwell*, 467 F.3d 999, 1009 (6th Cir. 2006) ("These factors are not prerequisites that must be met, but are interrelated considerations that must be balanced together. For example, the probability of success that must be demonstrated is inversely proportional to the amount of irreparable injury the movants will suffer absent the stay." (cleaned up)). But if the movant's showing on that prong is lacking, preliminary equitable relief is permissible only if there are at least "serious questions going to the merits *and* irreparable harm which decidedly outweighs any potential harm to the defendant if [a TRO] is issued." *Frisch's Rest.*, 759 F.2d at 1270 (quoting *Friendship Materials Inc. v. Mich. Brick, Inc.*, 947 F.2d 100, 105 (6th Cir. 1982)); *see also New Motor Vehicle Bd. of Cal. V. Orrin W. Fox Co.*, 434 U.S. 1345, 1347 n.2 (1977) ("A party seeking a restraining order must make a persuasive showing of irreparable harm and likelihood of prevailing on the merits.").

As relevant here, a movant shows irreparable injury by identifying a "harm [to him] … [that] is not fully compensable by monetary damages." *Overstreet v. Lexington-Fayette Urb. Cnty. Gov't*, 305 F.3d 566, 578 (6th Cir. 2002). And, to warrant

preliminary injunctive relief, "an injury must be both certain and immediate, not speculative or theoretical." *D.T. v. Sumner Cnty. Schs.*, 942 F.3d 324, 327 (6th Cir. 2019) (cleaned up); *accord Heidman v. S. Salt Lake City*, 348 F.3d 1182, 1189 (10th Cir. 2003).

## LAW AND ANALYSIS

The Court considers each of the temporary restraining order factors in turn, beginning with the likelihood of success on the merits. Weighing all four factors, the Court concludes that Mariner meets the requirements for a TRO. But it meets those requirements only as to non-solicitation, and, even then, only using a narrow definition of "solicitation."

### A.    Likelihood of Success on the Merits

The NSCAs state that they will be governed by Kansas law. (Doc. 1-2 ¶ 9, #43; Doc. 1-3 ¶ 9, #72; Doc. 1-4 ¶ 9, #80). The Court therefore applies Kansas law here.[2] Because Mariner seeks injunctive relief prohibiting use of confidential information, customer solicitation, and employee solicitation, the Court considers Mariner's likelihood of success on each separately. And, as discussed below, it finds that Mariner satisfies the first prong only as to customer solicitation, narrowly defined.

---

[2] "Although the parties do not engage in a conflict-of-law analysis, Ohio conflict-of-law rules give contractual choice-of-law provisions, like the one here, presumptive enforceability." *Cretor Constr. Equip. LLC v. Gibson*, ___ F. Supp. 3d ___, 2024 WL 3248669, at *5 n.4 (S.D. Ohio July 1, 2024) (citations omitted). The Court therefore applies Kansas law here "with the caveat that this determination is subject to revision were a party to challenge the validity of the agreement's choice-of-law provision." *Id.* (cleaned up).

1.     **Confidential Information**

To prevail on its misappropriation of trade secrets claims in violation of the federal Defend Trade Secrets Act (Count I) and the Ohio Uniform Trade Secrets Act (Count II), Mariner must show the same three things. *Qualus Corp. v. Wilson*, No. 1:23-cv-352, 2023 WL 6929721, at *3 n.2 (S.D. Ohio Oct. 18, 2023) ("The requirements for establishing misappropriation of trade secrets are substantially the same under the Defend Trade Secrets Act ('DTSA') and the Ohio Uniform Trade Secrets Act ('OUTSA'). Therefore, the same legal standard applies to Plaintiffs' likelihood of success on their claims under both statutes." (cleaned up)). Those are: "(1) the existence of a trade secret; (2) the acquisition of a trade secret as a result of a confidential relationship; and (3) the unauthorized use of a trade secret." *Id.* (quoting *Heartland Home Fin., Inc. v. Allied Home Mortg. Cap. Corp.*, 258 F. App'x 860, 861 (6th Cir. 2008)).

Mariner says Individual Defendants misappropriated confidential information in the form of (1) Morgan's calendar appointments and (2) the client invite spreadsheet he downloaded. Neither argument works. As to the calendar appointments, Morgan has attested that he only forwarded purely personal appointments. (Doc. 17-1, #265). And Plaintiff conceded during the telephone conference both that it did not have any evidence to dispute that account, and that purely personal calendar appointments are not protectable trade secrets. After all, a trade secret (1) "derives independent economic value, actual or potential," from its secrecy and (2) is subject to reasonable efforts to maintain its secrecy. Ohio Rev. Code § 1333.61(D). The Court is hard-pressed to see why Morgan's personal calendar

12

appointments—appointments that had nothing to do with meeting clients—derive economic value for Mariner from secrecy or were subject to reasonable efforts by Mariner to maintain such secrecy.

That leaves the spreadsheet. The problem there is that, even treating the information as protectable confidential information, Mariner has not shown that Morgan either wrongfully retained or used that information. The basis for Mariner's argument is that Morgan downloaded the information from a Mariner cloud account to his own work laptop. From there, Mariner suggests, he could have further printed it, downloaded it, or emailed it. But Morgan attests under oath that he did none of those things. According to Morgan, he downloaded the spreadsheet only to his work laptop, which laptop he returned to Mariner when he left. (Doc. 17-1, #264). And he also attests, again under oath, that he did not take the information with him in any way, share it with any third parties, or otherwise use it to his advantage. (*Id.*). Against that testimony, Mariner's speculation that Morgan may have used the spreadsheet in an unauthorized way does not suffice. *See Cleverland Holdings, LLC v. Mahan*, No. 1:23-cv-1571, 2023 WL 8039513, at *7 (N.D. Ohio Oct. 10, 2023) ("Plaintiff puts forth no evidence—either circumstantial or direct—of the disclosure of its confidential information. … [And] Plaintiff's forensic expert and Mr. Macias were unable to pinpoint and state with any certainty that Ms. Mahan had taken any confidential, trade secret information upon her termination of employment." (cleaned up)). So Mariner cannot rely on this argument to show a substantial likelihood of success on the merits as to its trade secrets claims.

Mariner's remaining allegations on this front consist of conclusory statements that Defendants stole its protectable confidential information. (*E.g.*, Doc. 1, #23 ("Mariner's customer information, including customer lists and customer information, are trade secrets … . Defendants have disclosed Mariner's trade secrets described above to, at least, Savvy and potentially other third parties who could obtain economic value from Mariner's trade secrets.")). Such conclusory statements likewise do not meet the standard for a TRO. *Patel*, 2020 WL 5849346, at *4; *see also Champion Foodservice, LLC v. Vista Food Exch., Inc.*, No. 1:13-cv-1195, 2016 WL 4468001, at *12 (N.D. Ohio Aug. 24, 2016) ("Conclusory statements as to trade secret factors without supporting factual evidence are insufficient to meet the burden of establishing trade secret status." (citation omitted)).

In short, based on the current record, the Court finds Mariner has not shown any meaningful likelihood of success on the merits as to its claims predicated on misappropriation of trade secrets and confidential information. So the Court denies preliminary injunctive relief as to those claims. *See Gonzales v. Nat'l Bd. of Med. Examiners*, 225 F.3d 620, 625 (6th Cir. 2000) ("Although no one factor is controlling, a finding that there is simply no likelihood of success on the merits is usually fatal.").

## 2. Customer Solicitation

Next, consider the customer non-solicitation claims. At the telephone conference, Mariner informed the Court that its best evidence on this front was Defendants' providing their new employment and contact information to clients with whom they did business at Mariner. And all parties agreed that the NSCAs did not

14

prohibit Individual Defendants from *accepting* business from Mariner clients if those clients reached out to Individual Defendants. So the Court instructed the parties to brief whether "solicitation"—a term not specifically defined in the NSCAs—prohibits providing former customers with new contact information under Kansas law.

To begin, the Court concludes that Mariner has shown that the non-solicitation provision is likely enforceable. Then, having reviewed the parties' submissions and conducted its own research, the Court finds that the mere provision of new contact information is not covered by a prohibition on solicitation. Rather, as discussed below, a narrower definition of "solicitation" is appropriate.

### i. The non-solicitation provision is likely enforceable.

Under Kansas law, "[a] noncompetition covenant ancillary to an employment contract is valid and enforceable if the restraint is reasonable under the circumstances and not adverse to the public welfare. … [I]t is well settled that only a legitimate business interest may be protected by a noncompetition covenant." *Weber v. Tillman*, 913 P.2d 84, 89 (Kan. 1996). In contrast, "[i]f the sole purpose is to avoid ordinary competition, [a restrictive covenant] is unreasonable and unenforceable." *Id.*; *see also Lawson v. Spirit AeroSystems, Inc.*, No. 18-1100, 2023 WL 4026509, at *7 (D. Kan. June 15, 2023) ("The paramount public policy is that freedom of contract is not to be interfered with lightly. Freedom of contract remains the driving force behind Kansas law on the enforcement of restrictive covenants." (cleaned up)). In determining whether a noncompete covenant is reasonable, courts applying Kansas law look to four factors. *Weber*, 913 P.2d at 90. Those are: (1) whether the covenant

protects a legitimate business interest, (2) whether it unduly burdens the employee, (3) whether it harms the public welfare, and (4) whether "the time and territorial limitations contained in the covenant [are] reasonable." *Id.*

As to the first factor, "[c]ustomer contacts are [] a long-recognized legitimate business interest that an employer can protect." *ConvergeOne, Inc. v. Logicalis, Inc.*, No. 2:22-cv-2151, 2022 WL 2791177, at *7 (D. Kan. July 15, 2022) (collecting cases). Mariner's stated aim—protecting its customer contacts and relationships—therefore counts as a legitimate business interest. So this factor favors Mariner.

As to the second factor, the customer non-solicitation provision does not prevent Individual Defendants from working as financial advisors. Nor are Individual Defendants prohibited from *accepting* business from former Mariner customers. They are simply forbidden from attempting to actively poach Mariner's customers with whom they developed relationships while they worked at Mariner as a way to build their books of business at their new employer. *See Caring Hearts Pers. Home Servs., Inc. v. Hobley*, 130 P.3d 1215, 1222–23 (Kan. Ct. App. 2006) ("[The agreements] do not prevent [the defendants] from obtaining other employment in the home health care industry or in caring for other patients. … [The defendants] have the entire remainder of the population of the metropolitan Kansas City area (or elsewhere, for that matter) to draw upon for prospective client-patients."). And no party has presented any evidence that this restriction amounts to prohibiting Defendants from working as financial advisors or otherwise substantially harms them in some other

way. The Court therefore concludes that the customer non-solicitation covenant does not unduly burden Defendants. So this factor also favors Mariner.

The third factor likewise favors Mariner because no party has introduced any evidence of harm to the public welfare. *Id.* at 354–55 ("[The defendants] did not present evidence ... [that] their former patients[' desires] would be thwarted if ... they were denied care that they specifically desired to receive from [the defendants]. But even if there were such evidence, the issue is public welfare, not the private welfare of an individual patient."). And this factor calls for the Court to weigh harms to the public caused by enforcing the agreement, such as a shortage of service providers in a particular industry, against limitations on the freedom to contract. *Digit. Ally, Inc. v. Corum*, No. 17-cv-2026, 2017 WL 1545671, at *11 (D. Kan. Apr. 28, 2017) ("The court then weighed the potential injury to the public that might arise from a shortage of dermatologists in Hays, Kansas, against the freedom to contract."). Because there is no evidence of any harm to the public to weigh against freedom of contract considerations, this factor favors enforcement.

Finally, the scope of the customer non-solicitation provision is reasonable. Although there is no territorial limitation to the scope, there is a temporal limit. Some courts have found such provisions to be neutral, rather than favoring either side. *See Digit. Ally*, 2017 WL 1545671, at *11. But given that the provision at issue here applies only to customers with whom Individual Defendants worked or otherwise developed relationships while they were employed at Mariner, the Court preliminarily finds the scope of the non-solicitation provision reasonable. *Caring*

17

*Hearts*, 130 P.3d at 1223 ("[T]he 2–year time period … is not unreasonably broad. The 100–mile radius of the restraint is not at issue since the agreement and the court's injunction cover specific patients served by [the defendants] in the past in the Kansas City area.")

Because all four *Weber* factors favor enforcement on the current record, the Court preliminarily finds that Mariner has shown that the customer non-solicitation provisions in Individual Defendants' NSCAs are likely enforceable. The Court therefore considers how to define "solicitation."

### ii.     Mere informational contacts are not solicitations.

"The issue of when a communication becomes a solicitation is in a sense a 'metaphysical' question, the answer to which turns out to be highly contextual." *Edward D. Jones & Co., L.P. v. Kerr*, 415 F. Supp. 3d 861, 873 (S.D. Ind. 2019). But "the majority of courts [that] [have] analyz[ed] this issue within the context of the financial broker/dealer industry reject the theory that an 'announcement' … qualifies as a solicitation … ." *Id.* (collecting cases); *see also MAI Sys. Corp. v. Peak Comput., Inc.*, 991 F.2d 511, 521 (9th Cir. 1993) ("Merely informing a former employer's customers of a change of employment, without more, is not solicitation."); *Wells v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 919 F. Supp. 1047, 1053 (E.D. Ky. 1994) ("[A] mere informational contact between the [sic] Wells and any former client does not constitute a '*solicitation*' under the employment agreements. An informational contact would consist of any written or oral contact that provides information about the Plaintiffs' whereabouts and how they may be contacted."); *H&R Block Fin.*

18

*Advisors, Inc. v. Schulte*, No. 1:08-cv-624, 2008 WL 11352567, at *1 n.1 (S.D. Ohio Sept. 18, 2008) ("A mere 'information contact' between Defendants and any former client will not constitute a 'solicitation.'" (citation omitted)); *ING Life Ins. & Annuity Co. v. Gitterman*, No. 10-4076, 2010 WL 3283526, at *4–*5 (D.N.J. Aug. 18, 2010) ("Merely being in contact with former clients does not constitute solicitation. … Nor does this Court believe that the circumstantial evidence relied upon by Plaintiffs— namely, the withdrawal of many client accounts in a short time frame—necessarily indicates that they were solicited or encouraged to leave." (collecting cases)).

The parties have not provided analogous cases decided under Kansas law that dictate a contrary conclusion. True, Mariner claims to have done so. But as described below, the Court disagrees. That leaves the Court with the background rule that courts must strictly construe language in restrictive covenants in Defendants' favor, especially as Mariner drafted the contract. *Sprint Corp. v. DeAngelo*, 12 F. Supp. 2d 1188, 1193 (D. Kan. 1998) ("Under Kansas law, covenants not to compete which are contained in employment contracts are strictly construed against employers."); *see also Prudential Sec., Inc. v. Plunkett*, 8 F. Supp. 2d 514, 518 (E.D. Va. 1998) ("Because the FAIT Agreement does not define the term 'solicitation' and New York case authority strictly construes restrictive covenants in employment contracts, the Court does not find that Prudential is likely to succeed on the merits."). The Court therefore finds that a mere informational contact standing alone is not prohibited customer "solicitation" within the meaning of the NSCAs. But other contacts with former Mariner customers that exceed these narrow notice communications are.

19

Mariner argues for a more expansive definition of "solicitation," but its arguments are ultimately unpersuasive. It mainly relies on *Edelman Financial Engines, LLC v. Susi*, No. 18cv6162, 2021 WL 306074 (D. Kan Jan. 28, 2021), a case it describes as "strikingly analogous." (Doc. 18, #267). To that end, Mariner notes that *Susi* likewise involved financial advisors who (1) were covered by a similarly worded non-solicitation provision; (2) likewise left their former employer to join a competitor; and (3) likewise contacted their former customers, asserting that the contacts were not a solicitation because they were for informational purposes only. (*Id*.). And Mariner correctly observes that the *Susi* court found that the employees violated the non-solicitation provision, although the court did not cite a single case, interpreting Kansas law or otherwise, for what activities fell within the term "solicitation." *Susi*, 2021 WL 306074, at *7. Rather, the court found that the employees engaged in forbidden solicitation presumably based on the court's own understanding of the term coupled with (1) the employees' blasting out a "tombstone" notification to all clients with the hopes that the clients would move, and (2) many of the former clients in fact shifting their business. *Id*.

But even beyond the *Susi* court failing to cite a single case in support of its definition of the term "solicit," let alone responding to the many cases cited above that take a different and narrower view of the term, the "tombstone" notification at issue in *Susi* strikes the Court as potentially meaningfully different from the contacts proven so far here. In particular, the *Susi* court expressly found, as a matter of fact, that the defendants there had (1) "intentionally drafted the tombstone notice in a way

20

that was intended to convey to [the former employer's] customers that defendants would be doing business in a superior way [at their new employer]," (2) put "the word 'fiduciary' in bolded font to try to distinguish the work the defendants planned to do [at their new employer]," and (3) "hoped the tombstone would influence … customers to follow them and conduct business with them at [the new employer]." *Id.* at *5. Moreover, the *Susi* court also found that, after leaving their former employer, the defendants in that case "provided information to [former] customers regarding [their new employer] and defendants' work with [the new employer][] [and] indicated to those customers that defendants would do a good job on their accounts, and that defendants believed [the new employer] would be different and better than [the former employer]." *Id.* To date, Mariner has shown no facts here similar to any of the above. Rather, so far as the Court knows now, the contacts were purely neutral, information-only contacts. If the facts elicited later change that characterization, the Court may find *Susi* more persuasive. But as things stand now, that is not the case.

Beyond that, several of the other cases Mariner cites involved express prohibitions on contacting clients and/or accepting their business. *API Americas Inc. v. Miller*, 380 F. Supp. 3d 1141, 1145 (D. Kan. 2019) ("Defendant agreed in pertinent part that, for one year following the date of his termination of employment with Plaintiff, he would not 'directly or indirectly contact, induce, entice or in any way attempt to solicit the hot stamping foils business of any of [Plaintiff's] customers.'"); *SRA Ins. Agency, LLC v. Virtus LLC*, No. 21-2181, 2021 WL 1840065, at *4 (D. Kan. May 7, 2021) ("The conversations clearly involved matters professional in nature.

Defendant Holt replied to offer advice and suggest a phone call for further discussion. … [T]he Stipulated Preliminary Injunction prohibited him from working with WestPro on a matter like this one." (citations omitted)); *Cybertron Int'l, Inc. v. Capps*, 501 P.3d 911, 2022 WL 128842, at *2 (Kan. Ct. App. 2022) (Table) (July 6, 2022) (restrictive covenant prohibited "contact[ing]" various persons "for the purpose of competitive business solicitation"); *Uarco Inc. v. Eastland*, 584 F. Supp. 1259, 1260–61 (D. Kan. 1984) (same). But Defendants are subject to no such specific prohibitions here—only a general prohibition on customer solicitation, which term the NSCAs do not define.

The remaining cases that Mariner cites all seemed to involve evidence, much like in *Susi*, of the defendants going beyond merely providing updated contact information in a neutral manner. *E\*Trade Fin. Corp. v. Eaton*, 305 F. Supp. 3d 1029, 1034 (D. Ariz. 2018) ("From this text string, the Court must conclude that Eaton [and D.N., his former client] … discussed the possibility of D.N. moving his accounts to Morgan Stanley. … This single exchange, the Court finds, demonstrates that E\*Trade is likely to succeed on the merits in proving Eaton solicited … D.N."); *Edelman Fin. Engines, LLC v. Visionary Wealth Advisors, LLC*, No. 20cv1338, 2021 WL 2367933, at *3 & *3 n.10 (Kan. Dist. Ct. June 09, 2021) ("This letter had the photos of the advisors, their new employer's logo, their new titles, and a statement saying that it is important that the clients know of their new employment. Edelman argues that this is … a solicitation designed to be visually appealing[.] … [T]he letters do have information and framing that is not neutral."). So those cases go more

to whether certain communications are correctly characterized as mere informational contacts, rather than whether mere informational contacts are prohibited.

For present purposes, the Court determines that "solicitation," as that term is used in the NSCAs, does not encompass purely informational customer contacts. But the term would include all other customer contacts aimed at inducing customers to leave Mariner and bring their business to Savvy. While Mariner has not established the latter in its Verified Complaint, it has alleged that Defendants have in fact contacted Mariner customers since leaving Mariner. (Doc. 1, #18–19, 21). And it is at least possible (though not yet proven) that those contacts included entreaties that constitute solicitation, even under the narrow definition of that term that the Court adopts here. Thus, with regard to the first prong governing its request for a TRO, Mariner has shown at least some likelihood of success on the merits as to the customer non-solicitation provisions.

### 3. Employee Solicitation

Finally, the Court considers the last basis for Mariner's TRO request: employee solicitation. Despite seeking injunctive relief prohibiting employee solicitation, (Doc. 9, #216), Mariner does not offer a single specific allegation that Defendants solicited any Mariner employees in any of its briefing. Nor did it present any such evidence during the telephone conference. So it has shown "no likelihood of success on the merits" as to any claims based on employee solicitation. *Gonzales*, 225 F.3d at 625.

\*          \*          \*

In short, the Court finds that Mariner has shown a meaningful likelihood of success only as to the prohibition on soliciting customers, with that term defined to exclude purely informational contacts to provide contact information. Mariner has shown no likelihood of success on the merits as to misappropriation of trade secrets or employee solicitation. So based on the record currently before it, the Court declines to enter a TRO on those latter two bases. *Gonzales*, 225 F.3d at 625. The Court therefore considers the remaining three TRO factors only as to the customer solicitation prohibition.

## B.     Irreparable Injury

Mariner also meets the second element—irreparable harm. To succeed on this element, the party seeking injunctive relief must show (1) a "harm … [that] is not fully compensable by monetary damages" or (2) "a violation of [its] constitutional rights." *Overstreet*, 305 F.3d at 578. The alleged "injury must be both certain and immediate, not speculative or theoretical." *Sumner Cnty. Schs.*, 942 F.3d at 327 (cleaned up); *accord Heidman*, 348 F.3d at 1189. "And, of course, as this action is between private parties and thus does not involve any constitutional claims, the irreparable-injury question reduces to whether Plaintiff has shown it will suffer, without Court intervention, some other kind of harms that are not fully compensable by money damages." *Cretor Constr. Equip. LLC v. Gibson*, ___ F. Supp. 3d ___, 2024 WL 3248669, at \*13 (S.D. Ohio July 1, 2024) (cleaned up).

24

"[A]n injury is not fully compensable by money damages if the nature of the plaintiff's loss would make damages difficult to calculate." *Basicomputer Corp. v. Scott*, 973 F.2d 507, 511 (6th Cir. 1992). In other words, this element asks whether, if the Court were to be wrong in denying a TRO, money damages (paid after judgment) would suffice to compensate the plaintiff for harm incurred during the litigation. And on that front, settled law holds that the "loss of customer goodwill … resulting from breach of a restrictive covenant constitutes irreparable harm" that is not compensable through money damages. *Hall v. Edgewood Partners Ins. Ctr., Inc.*, 878 F.3d 524, 530 (6th Cir. 2017); *accord Dominion Video Satellite, Inc. v. Echostar Satellite Corp.*, 356 F.3d 1256, 1263 (10th Cir. 2004) ("Courts finding irreparable harm from breaches of exclusivity provisions … have identified the following as factors supporting irreparable harm determinations: inability to calculate damages, harm to goodwill, diminishment of competitive positions in marketplace, loss of employees' unique services, [and] the impact of state law … ." (collecting cases)). Here, because Mariner is at risk of losing customer goodwill and customer relationships, the damages for which are difficult to calculate, Mariner has met its burden as to the second factor. *Edelman Fin. Engines, LLC v. Harpsoe*, No. 19-2026, 2019 WL 329547, at *3 (D. Kan. Jan. 25, 2019) ("[B]ecause defendants' actions will continue to affect the goodwill and relationships between plaintiff and its customers, monetary relief will not compensate plaintiff adequately for the harm it will sustain."); *Oldham Graphic Supply, Inc. v. Cornwell*, No. 09-1250, 2009 WL 3003850, at *14 (D. Kan. Sept. 17, 2009) ("The loss of customers and sales and the

25

threat of the continuation of such loss to a legitimate business interest is sufficient to show that a plaintiff will suffer irreparable injury unless protected by the court.").

## C. Equitable Balancing of Harms

The third prong, which calls for equitable balancing of harms, also favors Mariner. "In considering this factor, the Court must (1) balance the harm Plaintiff would suffer if its request for a [TRO] were denied against the harm Defendant[s] would suffer if an injunction were to issue, and (2) assess the impact the [TRO] might have on relevant third parties." *Cretor*, 2024 WL 3248669, at *14 (cleaned up). "The latter consideration applies only to specifically known, relevant third parties," of which there are none here. *Id.* The Court therefore compares only possible harms to the parties themselves.

As discussed above, in Part A.2.i., the harms to Defendants from enforcing the non-solicitation provision, which does not prevent them from earning a living in their chosen industry, are minimal. The potential harms to Mariner if Defendants wrongfully poach Mariner customers in the weeks leading up to the preliminary injunction hearing, on the other hand, could be substantial. Comparing those two, the balance of equities favors a limited TRO enforcing the NSCAs' non-solicitation provisions. *See Ever-Seal, Inc. v. Halferty*, No. 3:22-cv-00082, 2022 WL 418692, at *9 (M.D. Tenn. Feb. 10, 2022) ("[A]n injunction would enjoin Defendant from doing things he should not be doing anyway[.] … Plaintiff … is likely to be substantially harmed … because … poaching Plaintiff's customers … will result in Plaintiff's lost

business, customer relationships, profits, and so on. Thus, the … balance of harms weighs in favor of granting injunctive relief … .").

## D.   The Public Interest

The final element of the analysis is the harm to the public occasioned by wrongly entering or (failing to enter) a temporary restraining order. Because the Court would issue a narrowly tailored TRO that merely prohibits solicitation of Mariner customers, such a TRO will not deprive customers of their choice of provider. *See Cretor*, 2024 WL 3248669, at *15. And no party has identified any other harm to the public caused by entering a TRO. There is also a public policy favoring the enforcement of valid contracts. *Harpsoe*, 2019 WL 329547, at *3 ("[B]oth Kansas and Ohio law recognize the public policy of enforcing valid non-compete contractual covenants."); *Universal Engraving, Inc. v. Duarte*, 519 F. Supp. 2d 1140, 1152 (D. Kan. 2007) ("[T]he Kansas Supreme Court [has] noted[] [that] freedom of contract is paramount public policy."). So the final TRO factor favors injunctive relief.

*          *          *

In short, the Court finds that all four factors it must consider favor granting limited injunctive relief here. Accordingly, taking the four factors as a group, the Court concludes that a narrow TRO proscribing only customer solicitation, as that term is described above, is warranted.

## CONCLUSION

For the above reasons the Court **GRANTS IN PART** Mariner's Motion for Temporary Restraining Order (Doc. 9). Specifically, effective July 19, 2024, the Court **ORDERS** that:

1. "Informational contacts" means any written or oral contacts that merely provide, in a neutral manner, and without any request for business or effort to "sell" the new employer's products or services, contact information (business addresses, email addresses, and telephone numbers) for Individual Defendants.

2. "Solicitation" or "soliciting" means any customer contacts beyond mere "informational contacts" that are designed to persuade a Mariner customer to leave Mariner, or to move any portion of that customer's business to Savvy. The terms do not include, however, information that Individual Defendants provide in direct response to a question that a former customer poses to them, such as "What would I need to do to transfer my business to you?" or "Are you willing and able to provide services to me at your new business?"

3. Gerard, Kunkel, and Morgan are hereby specifically enjoined from directly or indirectly soliciting Mariner customers to whom they provided services while at Mariner, or with whom they otherwise did business while at Mariner,

4. Morgan is also enjoined from directly or indirectly soliciting any Mariner customer whose identity he learned as a result of his employment at Mariner.

This temporary restraining order will continue through the preliminary injunction hearing unless otherwise ordered by this Court. Because of the limited relief ordered

28

here, the Court determines that Plaintiff need not post a bond at this time. The Court will promptly set this matter for a preliminary injunction hearing subject to the parties providing the Court a jointly agreed calendar for such a hearing, or, if the parties cannot agree on such a calendar, the Court setting one.

**SO ORDERED.**

July 19, 2024
**DATE**

**DOUGLAS R. COLE**
**UNITED STATES DISTRICT JUDGE**